**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STANLEY BOCLAIR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 C 08630 |
| | ) | |
| SALVADOR A. GODINEZ, MICHAEL A. | ) | Judge John J. Tharp, Jr. |
| LEMKE, TERRI ANDERSON, MARCUS | ) | |
| HARDY, ADA JOHNSON, KAREN MARIE | ) | |
| RABIDEAU, DONALD WILLIAMS, | ) | |
| KENNETH NUSHARDT, TYRUS LAZARD, | ) | |
| JOHN SIEVERS, BRANDON FRANCO, | ) | |
| MICHAEL BOWLIN, LESTER HAWK, | ) | |
| ANTOINETTE FLORENCE, EDUARDO | ) | |
| CERVANTES, CHAZ L. MONTES, | ) | |
| BUCKHART, VEGARA, and TARRY | ) | |
| WILLIAMS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stanley Boclair brings his Second Amended Complaint pursuant to 42 U.S.C. § 1983, alleging that the defendants, all current or former prison officials, have violated his Eighth Amendment rights while he has been incarcerated at the Stateville Correctional Center in Crest Hill, Illinois. Specifically, Boclair alleges that prison officials have violated the Eighth Amendment's prohibition on cruel and unusual punishment by housing him in "cruel, inhumane, and degrading living conditions and exposing [him] to extreme cold for several hours" (Count I), and by failing to protect him from other inmates by ignoring gang members' threats against him (Count II). Second Am. Compl. ("SAC") at 18, 19, ECF No. 68. The defendants have moved to dismiss the Second Amended Complaint in its entirety. For the reasons set forth below, the Motion to Dismiss is granted in part and denied in part.

## BACKGROUND

In deciding a motion to dismiss under Rule 12(b)(6), the Court takes as true all well-pleaded facts alleged in the complaint and draws all reasonable inferences in favor of the non-moving party. *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2012). The Court therefore accepts the following facts as true for the purposes of deciding the defendants' Motion to Dismiss. Boclair asserts the majority of these facts in both his first amended complaint and his Second Amended Complaint; the following recitation adheres to his Second Amended Complaint. Boclair filed that pleading in October 2015 after the defendants lodged their Motion to Dismiss, though this Court granted defendants leave to respond to any new allegations in their Reply brief.

Boclair has been incarcerated since 1982, and is currently held in custody by the Illinois Department of Corrections ("IDOC") at Stateville. SAC ¶ 19. At the time he filed his Second Amended Complaint, he was 54 years old. *Id.* The defendants are all current or former IDOC officials, and are identified in greater detail below. *Id.* ¶ 2. During the times relevant to this case, the IDOC housed Boclair in a section of Stateville known as F-House, which was built in the early twentieth century. *Id.* ¶ 40. Boclair alleges on information and belief that "about 65% of the cells in F-House lack properly functioning toilets, heaters, and windows." *Id.* Boclair alleges that the defendants subjected him to "inhumane and degrading conditions of confinement" at Stateville. *See id.* at 9.

One such condition was an under-heated cell. *See id.* Boclair began his four-week stay in that cell in F-House, dubbed Cell #461, on November 23, 2011, even though "the [d]efendants already knew that the cell was in disrepair." *Id.* ¶ 43. The cell's windows did not provide adequate insulation from the cold winds and outside weather, and the heater in the cell was

"barely functional," to the degree that the cell was "like a freezer." *Id.* ¶ 44. Boclair would tear strips from his bath towel, apply toothpaste to the strips, and place the strips in the window frame in order to prevent water and cold air from entering the cell. *Id.* Boclair filed an emergency grievance, Grievance No. 4356, about the cold on November 25, 2011. *Id.* ¶ 45. Defendant Marcus Hardy, who was Stateville's warden from January 1, 2009, to December 31, 2012, and was responsible for the disposition of all inmate grievances during that time, responded to Boclair's Grievance No. 4356 on December 12, 2011, by denying that the "bitter cold" in the cell qualified as an emergency. *Id.* ¶ 24, 46. Boclair then submitted that same grievance as a regular grievance through his counselor on December 21, 2011, and also filed his grievance with a grievance officer on December 27, 2011. *Id.* ¶ 47. The grievance officer never responded. *Id.* ¶ 48.

Boclair was also housed in cells infested with cockroaches. He filed an emergency grievance, Grievance No. 87, about the issue on January 10, 2012, "informing Defendant Hardy and other Stateville officials that there was a massive cockroach infestation in his F-House cell." *Id.* ¶ 49. Boclair's grievance asserted that the insects "were in his bed as he slept, fouled his sheets and underwear, and fell from the ceiling onto his food tray as he ate." *Id.* Hardy responded on January 19, 2012, again denying that Boclair's allegations indicated an emergency. *Id.* ¶ 50. Nearly four months later, a grievance officer also responded to Grievance No. 87, recommending on May 2, 2012, that prison officials take no action given that Boclair had been relocated to a different F-House cell since lodging his official complaint. *Id.* ¶ 51. Hardy formally concurred with the grievance officer's report the next day, and on August 23, 2012, Gina Allen—who is not a defendant in this case—of the Administrative Review Board ("ARB") found there was no reason to consider Grievance No. 87 any further. *Id.* ¶¶ 52-53. Despite these officials' findings,

the new F-House cell to which Boclair was moved was also infested with cockroaches, and overall he spent at least seven months in cockroach-infested F-House cells. *Id.* ¶¶ 54-55.

Inadequate plumbing and another incidence of cold temperatures also plagued Boclair's incarceration during the time at issue in this suit. Defendant Ada Johnson, a placement officer and counselor at Stateville who is responsible for evaluating inmates before their assignment to cells, work details, or living units, moved Boclair on January 13, 2012, "to a 'condemned' cell in F-House (Cell # 209) in retaliation for filing" the grievances outlined above. *Id.* ¶ 56. The cell had a toilet that overflowed when flushed, and on January 14, 2012, Boclair "was reduced to pouring feces and urine" from the toilet out of the cell's window. *Id.* ¶ 58. Defendant Tyrus Lazard, a correctional officer, verbally acknowledged to Boclair that the toilet was malfunctioning, and Boclair alleges that Lazard therefore was required to ensure that Boclair be moved to a different cell with a working toilet. *Id.* ¶ 59. Lazard only had the cell vacuumed, however, before placing Boclair back inside it, and ignored Boclair's requests to be placed in a different cell. *Id.* The following day, on January 15, 2012, defendant and correctional officer Kenneth Nushardt "observed waste on the floor of the cell from the overflowing toilet," but still placed Boclair in the cell, telling him that he "'ha[d] no choice.'" *Id.* ¶ 60. The waste from the toilet eventually began spilling into the cell house gallery, and on January 16, 2012, defendants Buckhart, Vegara,[1] and Eduardo Cervantes—all correctional officers—ordered Boclair to mop the gallery to clean up the mess. *Id.* ¶ 61. Defendant Donald Williams, a correctional sergeant, "oversaw this forced mopping of [Boclair's] excrement and urine." *Id.*

---

[1] Boclair does not know Buckhart and Vegara's first names, but states in the Second Amended Complaint that "Buckhart is a white male, and Vegara is a Hispanic male." SAC at 2 n.1.

That same day, defendant Brandon Franco, another correctional officer, came to Boclair's cell and handcuffed him. *Id.* ¶ 62. Defendant John Sievers, a correctional sergeant, ordered Franco via radio to place Boclair and another inmate in an empty shower, where Boclair remained for several hours wearing handcuffs and only a t-shirt, shoes, and pants. *Id.* The shower "was bitter cold because the outdoor temperature that day never rose above freezing, and the shower had a cracked window." *Id.* For at least five hours, Boclair "was left shivering and in severe pain" from the cold. *Id.* Boclair filed an emergency grievance, Grievance No. M557, on January 18, 2012, asserting that the cell's toilet overflowed when flushed and describing the conditions and treatment he experienced as a result. *Id.* ¶ 57. A grievance officer issued a report in response on October 2, 2012, recommending that prison officials take no action, claiming that F-House staff did not recall any of the incidents Boclair had recounted, and stating that she could not substantiate any misconduct by prison staff members. *Id.* ¶ 63. On October 15, 2012, Hardy formally concurred with that assessment, and on May 23, 2012, the ARB found that there was no justification for considering Grievance No. M557. *Id.* ¶¶ 64-65.

In addition to poor prison conditions, Boclair asserts that the defendants failed to protect him from other inmates. Boclair was once affiliated with the Gangster Disciples gang, but stopped all involvement with gangs in or around 2006. *Id.* ¶ 67. Since his renunciation of his former lifestyle, the Gangster Disciples have threatened him, beginning when he was housed at other correctional facilities and continuing to his incarceration at Stateville. *Id.* Boclair asserts that he is not physically capable of defending himself against inmates who are violent, much younger than he, and who have the support of dangerous gangs. *Id.* Boclair also alleges generally that the defendants knew that Boclair was endangered by members of Gangster Disciples

factions such as the Black Gangster Disciples ("GDs") and Black Disciples ("BDs"), both of which IDOC has classified as Security Threat Groups ("STGs"). *Id.* ¶¶ 68-69.

Boclair settled a prior lawsuit he filed in this District over the alleged failure of IDOC officials to protect him from known dangers. *Id.* ¶ 73; *see also Boclair v. Randle et al.*, No. 11 C 5217 (N.D. Ill.). In that case, Boclair alleged that he was physically attacked by inmates in February 2011, that he had to be hospitalized for four days as a result, and that he notified a Stateville correctional officer that his attackers had identified themselves to him as GDs. SAC ¶ 74. Boclair alleges that new threats to his safety have arisen since he settled his prior case on August 10, 2013, and that the defendants in this suit have continued to ignore his grievances about those threats. *Id.* ¶ 76.

Specifically, Boclair filed a request for protective custody on March 17, 2013. *Id.* ¶ 80. Boclair was placed in protective custody on July 31, 2013, but alleges that defendant Michael A. Lemke, who was the warden of Stateville during the 2013 calendar year, and defendant Karen Rabideau, a placement officer and counselor, retaliated against him for his prior lawsuit and grievances by ordering him removed from that custody just five days later, on August 5, 2013. *Id.* ¶ 81. Defendant Terri Anderson, the Chairperson of the IDOC ARB at this time, held an ARB hearing on Boclair's protective custody request on August 12, 2013, and denied his request on August 21 of that year. *Id.* ¶ 80. Defendant Salvador A. Godinez, the IDOC Director who was responsible for IDOC's day-to-day operations, agreed with Anderson's decision. *Id.*

Boclair handed defendant Lester Haw, a correctional officer, another protective custody request form on August 23, 2013, and Hawk told him he would deliver the request to Boclair's counselor or to Internal Affairs. *Id.* ¶ 82. That same day, defendant Michael Bowlin, another correctional officer, came to Boclair's cell and said to him, "I know I'll get in legal trouble, but

you are not allowed to request protective custody." *Id.* ¶ 83. Defendant Chaz L. Montes, another correctional officer, also approached Boclair's cell that day to tell Boclair that he was not allowed to request protective custody while in Stateville, and that Rabideau would not accept any such request. *Id.* ¶ 84.

A flurry of grievances followed those conversations. Boclair filed a grievance with Godinez on August 25, 2013, and Anderson decided on September 18, 2013 that the grievance did not warrant consideration. *Id.* ¶ 85. Also on August 25, 2013, Boclair lodged an emergency grievance, Grievance No. 2709, with Lemke regarding Hawk, Bowlin, and Montes' statements that Boclair was not permitted to request protective custody. *Id.* ¶ 86. Lemke rejected the emergency grievance on September 12, 2013, and told Boclair to pursue the regular grievance process instead. *Id.* ¶ 87. Boclair submitted Grievance No. 2709 to a grievance officer on September 29, 2013, but never received a response, despite Illinois regulations requiring one. *Id.* ¶ 89 (citing 20 Ill. Adm. Code 504.830(d)). Boclair also asserts that he submitted "another [protective custody] request" on September 3, 2013, to defendants Sievers and Antoinette Florence—both correctional officers—and that on September 29, 2013, he submitted emergency Grievance No. 3620 to Lemke regarding Sievers' and Florence's refusal to process that September 3 request. *Id.* ¶¶ 90-91. Lemke told Boclair on October 11, 2013, that he should submit that grievance to the regular process, rather than as an emergency. *Id.* ¶ 92.

Meanwhile, since September 2013, known STG member and Stateville inmate Jarvis "Jiro" Jackson had been "encouraging other gang members to 'hit Boclair!' for the killing of Thomas 'Digger' Riley." *Id.* ¶ 77. On October 31, 2013, after Boclair had eaten his evening meal in the dining room, several other STG members Boclair knows only as "Big A," "Wild Wild," and "Goo" threatened him outside his cell. *Id.* ¶ 78. "Big A" told Boclair, "[Y]ou will get tossed

over 'three gallery' for Digger getting killed." *Id.* "Three gallery" is three stories high. *Id.* Boclair argues that given his history of being attacked by known STG members while in custody, the defendants should have taken these latest threats to heart and put him in protective custody quickly, but that they failed to do so. *Id.* ¶ 79.

Also on October 31, 2013, Boclair submitted Grievance No. 3620—concerning Sievers' and Florence's refusal to process his protective custody request—to "Counselor Duvall," who is not named as defendant or otherwise identified in the Second Amended Complaint. *Id.* ¶ 93. Boclair submitted that same grievance to a Stateville grievance officer on November 15, 2013. *Id.* ¶ 94. On April 8, 2014, the grievance officer recommended that no action be taken on Grievance No. 3620 and noted that Boclair was an "ARB kickout," meaning that the ARB had already reviewed and rejected Boclair's protective custody requests. *Id.* ¶ 95. Defendant Tarry Williams, then the warden of Stateville, concurred with that report and dismissed Grievance No. 3620. *Id.* ¶ 96. Boclair asserts that as a result of the defendants' failure to respond to his requests for protective custody, he was physically assaulted on May 2, 2015 by "other inmates" who kicked him in the head and injured his head, leg, knees, shoulder, and back. *Id.* ¶ 105.

In Count I of his Second Amended Complaint, Boclair brings a claim for violation of the Eighth Amendment for infliction of "cruel and unusual punishment and retaliation" based on the alleged prison conditions he experienced. SAC at 18. He asserts that claim against Godinez, Hardy, Rabideau, Johnson, Donald Williams, Nushhardt, Lazard, Sievers, Franco, Buckhardt, Cervantes, and Vegara. In Count II, Boclair brings another Eighth Amendment claim for infliction of "cruel and unusual punishment and retaliation" based on his allegations that prison officials intentionally ignored threats by STG members. SAC at 19. Boclair brings Count II against Godinez, Rabideau, Tarry Williams, Lemke, Anderson, Bowlin, Haw, Florence, Sievers,

and Montes. For each count, Boclair is seeking general damages of at least $20,000 against each defendant, to be imposed jointly and severally, for emotional distress, as well as punitive damages and attorney's fees and costs. Boclair also seeks a permanent injunction prohibiting defendants from "retaliating against Plaintiff by housing him in inhumane and degrading conditions," and from "retaliating against Plaintiff for exercising his rights and requiring Defendants to place Plaintiff in protective custody in a facility where he is housed separately from general population inmates and otherwise protect him from known and reasonably foreseeable threats including STGs whose members have expressed a desire to harm him." SAC ¶¶ 100, 106. Boclair sues Godinez, Anderson, and Tarry Williams in their official and personal capacities, and targets all other defendants only in their personal capacities.

The defendants moved to dismiss Boclair's first amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) in July 2015. Mot. to Dismiss, ECF No. 55; Defs.' Mem. Supp., ECF No. 56. Boclair filed his Response, as well as a motion for leave to file a Second Amended Complaint, in September 2015. *See* Mot. for Leave to File, ECF No. 65. This Court granted that motion, and clarified that rather than require a new motion to dismiss, the defendants' original motion would stand, but that the defendants could respond to any new allegations in the Second Amended Complaint in their Reply brief. *See* Order of Oct. 2015, ECF No. 67. The Court also granted Boclair leave to file a sur-reply. *Id.* Since filing the Second Amended Complaint and the Response brief on Boclair's behalf, Boclair's appointed counsel has withdrawn from the case without objection. *See* Mot. to Withdraw, ECF No. 79; Order of Nov. 2016, ECF No. 92. Boclair has not filed a formal sur-reply. He did lodge a *pro se* motion to supplement to his Second Amended Complaint in October 2016, Mot. to Supplement, ECF No. 93, which this Court denied

without prejudice pending a ruling on the motion to dismiss. *See* Order of Dec. 2016, ECF No. 97.

**DISCUSSION**

To defeat a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible "'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). Rule 8(a)(2) requires just "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That standard does not require a plaintiff to bring "detailed factual allegations," but the Supreme Court has specified that Rule 8(a) requires more than "labels and conclusions," and that "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

**I. Count Based on Conditions of Confinement**

People who are incarcerated "are entitled to confinement under humane conditions which provide for their 'basic human needs.'" *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). The Eighth Amendment imposes a duty on "prison officials [to] ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Yet prison conditions "may be harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th

10

Cir. 1997) (citing *Farmer*, 511 U.S. at 833-34). A claim of constitutionally inadequate confinement requires a two-step analysis: (1) "whether the conditions at issue were sufficiently serious so that a prison official's act or omission result[ed] in the denial of the minimal civilized measure of life's necessities;" and (2) "whether prison officials acted with deliberate indifference to the conditions in question." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (internal quotation marks and citation omitted). Deliberate indifference "means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." *Id.*

The defendants' overall arguments as to Count I are that while Boclair has alleged living conditions at Stateville that are "unpleasant," they do not rise to the level of violating the Constitution, and that Boclair has at times failed to allege that the defendants acted with deliberate indifference. Mem. at 4, 7. Boclair argues in response that the defendants' description of the alleged conditions is disingenuous, and that the defendants' arguments regarding deliberate indifference rely on an improper interpretation of case law. Resp. at 1, 5, ECF No. 64.

**A. Under-heated Cell**

Boclair has failed to state a claim for violation of the Eighth Amendment based on the four weeks he alleges he spent in a cold cell in November and December of 2011. A prisoner's right to humane conditions includes "a right to be free from extreme hot and cold temperatures," but it is also true that "the Constitution does not give inmates the right to be free from all discomfort." *Shelby Cnty. Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir. 1986); *see also Dixon*, 114 F.3d at 644. The Seventh Circuit has also stated that when addressing whether cold cell temperatures were sufficiently serious to indicate an Eighth Amendment violation, courts should consider factors "such as the severity of the cold; its duration; whether the prisoner

has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Dixon*, 114 F.3d at 644. "Cold temperatures need not imminently threaten inmates' health to violate the Eighth Amendment." *Id.* (citing *Del Raine v. Williford*, 32 F.3d 1024, 1035 (7th Cir. 1994)).

Boclair has simply not alleged sufficient facts to indicate that the cold conditions in his cell were so severe that they constituted an Eighth Amendment violation. He alleges that his cell windows "were inadequate to insulate the cell from the cold winds and inclement weather," but does not assert that the windows were broken, cracked, or failed to close. Such details would not establish a constitutional violation on their own, of course, but they could go toward supporting an inference of actionable prison conditions. *Cf. Haywood v. Hathaway*, 842 F.3d 1026, 1030 (7th Cir. 2016) (reversing summary judgment for prison officials where inmate contended his cell had a broken window and that "guards refused to repair the window or provide adequate clothing and blankets"); *Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016) (reversing summary judgment for prison warden and noting that while "a broken window at a detention facility is not, itself, a constitutional violation," broken windows exacerbated the complained-of conditions and made some of the prison's remedial efforts ineffective). Boclair references a heater that was "barely functional" and says the cell was "like a freezer," arguing in his Response that "[a] freezer keeps a constant temperature of below freezing." *See* Resp. at 2. But Boclair does not make any allegations regarding the impact that the alleged cold had on his day-to-life or level of comfort, much less allege that the cold caused him *severe* discomfort. *See Dixon*, 114 F.3d at 644. ("Prisoners have a constitutional right not to be confined in a cell at so low a temperature as to cause severe discomfort[.]" (internal quotation marks omitted)); *see also Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) (noting that "the Constitution does not mandate comfortable prisons").

Boclair also asserts that he was able to adhere strips of his towel to the window frames to prevent cold air from flowing into the cell, and does not allege that his clothing was insufficient or that he asked for, and was refused, additional clothing or blankets.

Boclair does allege that he experienced these cold conditions for four weeks, placing him well beyond the "temporary inconvenience" of the two-and-a-half-day period in *Johnson v. Pelker*, 891 F.2d 136 (7th Cir. 1989), that the defendants assert is comparable to Boclair's experience. *See* Mem. at 5-6. But duration alone cannot support Boclair's claim where he has failed to adequately allege that the cold was severe, or to allege in any regard that he was refused, or otherwise lacked, adequate alternative means to protect himself from the cold. The other allegations that Boclair raises in connection with his conditions of confinement claim—a cockroach infestation, malfunctioning toilet, and several hours spent in a cold shower area—also did not occur during the four weeks Boclair says he was housed in the freezer-like cell. Boclair's allegations regarding that four-week time period therefore do not satisfy the first prong for establishing an Eighth Amendment prison conditions claim based on cold temperatures. This portion of Count I is dismissed without prejudice. As explained later in this Opinion, if Boclair seeks to re-plead his claim regarding the under-heated cell, he must do so by filing a new case.

**B. Cockroaches**

Boclair has similarly failed to state a claim for violation of the Eighth Amendment based on his exposure to cockroaches. The Seventh Circuit has held that "a prolonged pest infestation, specifically a significant infestation of cockroaches and mice, may be considered a deprivation sufficient to constitute a [constitutional] violation." *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996)). To succeed on an Eighth Amendment claim based on a cockroach infestation, a plaintiff must also allege some form of

harm, be it physical injury, psychological harm, or "hazard, or probabilistic harm—'loss of a chance,' as it is called." *Thomas v. Illinois*, 697 F.3d 612, 614-15 (7th Cir. 2012). This Court notes, however, that without alleging a physical injury, a prisoner may not recover compensatory damages. 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act[.]"); *see also Thomas*, 697 F.3d at 614 ((noting that "a prisoner cannot obtain compensatory damages without proving a physical injury," but that "physical injury . . . is not a filing prerequisite for the federal civil action itself . . . because the prisoner can still obtain injunctive relief, nominal damages, and punitive damages") (internal quotation marks and citations omitted)).

Boclair alleges that cockroaches "were in his bed as he slept, fouled his sheets and underwear, and fell from the ceiling onto his food tray as he ate." He also asserts that he spent at least seven months in cockroach-infested cells, though he does not allege when he was moved from the first infested cell to another cell and does not describe the second cell's conditions other than to say it "was also infested." Boclair also does not allege that he was bitten or otherwise suffered any physical injury, and his allegations that he suffered "psychological trauma" and was exposed to a "serious risk of injury" are not specific to the cockroach infestation, but refer to the sum of the allegations underlying Count I as a whole. *See* SAC ¶ 98.

These allegations are insufficient, and do not indicate an exposure to cockroaches that rises to the level of severity that the Seventh Circuit has generally recognized as being actionable in prison conditions cases. Boclair's allegations do not indicate the type of severe infestation paired with "significant physical harm" that the Circuit Court found to exist in *Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996), where the plaintiff alleged "cockroaches that were

'everywhere,' 'crawling on his body' (along with mice) and 'constantly awaken[ing]' him, and 'causing the environment to be unsanitary.' *Id.* at 1431. Boclair's pleading also falls well short of the assertions the Seventh Circuit found to state a claim—though it was a "close case"—in *White v. Monohan*, 326 Fed. App'x 385 (7th Cir. 2009), where the plaintiff alleged that "for over five years the 'bugs, roaches, spiders, wasps, [and] bees' had bitten and stung him so often as to leave multiple scars, wounds, and sores, causing him internal injuries." *Id.* at 388. Though his Second Amended Complaint does provide more substance than the simple "laundry list" of pests the plaintiff alleged unsuccessfully in *Smith v. Dart*, 803 F.3d 304 (7th Cir. 2015), Boclair similarly does not allege "that he's been bitten or stung or otherwise suffered physical or psychological harm, or that his property has been damaged," and raises no allegations regarding how often he observes the cockroaches, "whether it's continuously or only from time to time." *See id.* at 312. Boclair's cockroach allegations therefore fail to satisfy the first prong for establishing an Eighth Amendment claim prison conditions claim, and this portion of Count I is dismissed without prejudice.

Should Boclair decide to replead his claims regarding the under-heated cell or the cockroach infestation, however, he must file each claim as a new case, separate from this current action. The dismissed claims are not properly joined to the claims that this Court is allowing to move forward.[2] As the Seventh Circuit stated in *George v. Smith*, 507 F.3d 605 (7th Cir. 2007):

> The controlling principle appears in Fed. R. Civ. P. 18(a): "A party asserting a claim to relief . . . may join, either as independent or as alternate claims, as many claims, legal, equitable, or maritime, as the party has against an opposing party." Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2.

---

[2] The claims that survive the motion to dismiss could be severed from each other well. Given that this suit is now three-and-a-half years down the road, however, this Court declines to do so.

> Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that this 50–claim, 24–defendant suit produced but also to ensure that prisoners pay the required filing fees—for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g).

*Id.* at 607. Boclair may not "throw all of his grievances, against dozens of different parties, into one stewpot," but instead may pursue only one claim—or claims against just one defendant or discrete group of inter-related defendants—under a single case number. *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 683 (7th Cir. 2012). In addition, if Boclair is unable to type his future submissions in this case, or in any new case he might file, he should use neat, block printing. His handwriting, though neat, is extremely stylized and often difficult to read. It is in Boclair's own interest to make his submissions as legible and as easy to understand as possible. Finally, while Boclair is not precluded from seeking leave to file supplemental documentation as he did in this case, *see* Mot. to Supplement; Supplement, ECF No. 96, he must be more selective in choosing what documents to include in such filings. He may not use such supplemental briefs to raise new and unrelated allegations or to otherwise skirt the joinder rules discussed above.

### C. Inadequate plumbing and time spent in cold shower

Boclair has adequately stated a claim for violation of the Eighth Amendment based on the January 2012 incidents in which (1) his cell's toilet malfunctioned and (2) he spent several hours in a cold and empty shower. The Motion to Dismiss is denied as to these allegations.

The conditions Boclair describes in regards to the overflowing toilet are severe enough to satisfy the first prong for stating an Eighth Amendment claim. The Seventh Circuit has "repeatedly stressed" that "the Eighth Amendment requires prison officials to maintain minimal sanitary and safe prison conditions." *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989). That Court has recognized Eighth Amendment conditions claims involving exposure to human waste.

*See Wheeler v. Walker*, 303 Fed. App'x 365, 368 (7th Cir. 2008) (finding prisoner stated a claim where he alleged "that for two weeks prison guards, without explanation, ignored his requests for basic cleaning supplies while he was exposed to a combination of a heavy roach-infestation, filth, and human waste"); *Vinning-El v. Long*, 482 F. 3d 923, 923-25 (7th Cir. 2007) (reversing summary judgment where a prisoner spent six days in a cell with blood and feces smeared on the walls, water covering the floor, and a broken sink); *Johnson*, 891 F.2d at 139 (reversing summary judgment where officials denied prisoner's requests for cleaning supplies and he spent three days in a cell with feces smeared on the walls and no running water). The Tenth Circuit has aptly opined that "[e]xposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment." *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001); *see also Wheeler*, 303 Fed. App'x at 368 (quoting same); *Vinning-El*, 482 F. 3d at 924 (citing *DeSpain*'s finding that 36 hours of exposure to human waste is a sufficiently serious deprivation to constitute an Eighth Amendment violation).

The defendants argue that Boclair has failed to allege that the defendants acted with deliberate indifference in regard to the toilet because he does not allege "how he knew" that Johnson was responsible for placing him in the problematic cell, nor does he assert any facts indicating that Lazard or Nushardt had the authority to move him to a new cell. Mem. at 6-7. The defendants are correct that prison officials "do not act with 'deliberate indifference' if they are helpless to correct the protested conditions." *See Dixon*, 144 F.3d at 645 (citing *Del Raine v. Williford*, 32 F.3d 1024, 1038 (7th Cir. 1994)). At this early pleading stage, however, Boclair does not need to provide evidence indicating what particular remedies were or were not within each official's power. Deliberate indifference "means that the official knew that the inmate faced

a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." *Townsend*, 522 F.3d at 773.

Boclair has sufficiently alleged deliberate indifference to state a claim in regards to the toilet. He alleges that Lazard verbally acknowledged that the toilet was malfunctioning, but merely had the cell vacuumed and then ignored Boclair when he "begged" not to be placed back in the cell. He also asserts that Buckhart, Vegara, and Cervantes forced him—with oversight from Williams—to mop up his own waste from the gallery floor. Boclair further alleges that Nushardt saw waste on the cell's floor from the overflowing toilet, but still put Boclair back inside. Boclair's allegation that Nushardt said he "ha[d] no choice" when he placed him back in the cell is also not an admission that Nushardt was *in fact* powerless to alleviate the issue, only that Nushardt *said* he was. The defendants are free to argue at the summary judgment stage, once discovery is complete, that the evidentiary record establishes that those officials were in fact helpless to change Boclair's conditions. *See Dixon*, 144 F.3d at 645 (in reversing summary judgment for the defendants, finding that "[b]ecause the record as developed does not demonstrate that defendants were powerless to correct the conditions that Dixon alleged to exist, there are triable issues concerning both defendants' actual knowledge of the conditions, and their ability to correct them").

The incident in which Boclair spent several hours in a cold and empty shower also states a claim for violation of the Eighth Amendment. Boclair's allegations in this regard provide a sort of foil to his earlier allegations of cold temperatures. In connection with the shower incident, he alleges that he was left there handcuffed and wearing "only" a t-shirt, shoes, and pants, that the temperature outside that day never rose above freezing, and that the shower had a cracked window. He also alleges that he was "left shivering and in severe pain" from the cold for at least

five hours. These are the type of factual allegations that are missing from his claim of an under-heated cell, and they assert a sufficiently severe situation to state an Eighth Amendment claim.

The defendants argue that Boclair "does not allege that he was removed from his cell for anything other than a legitimate penological purpose." Mem. at 7. The defendants miss the point. When bringing a claim for conditions of confinement, it "is immaterial whether such conditions result from restrictions imposed for administrative, rather than punitive, reasons." *Caldwell v. Miller*, 790 F.2d 589, 600 (7th Cir. 1986). In other words, Boclair need not raise factual allegations at this stage of the proceedings as to why this incident occurred. His allegations that it did, including his descriptions of how the conditions in the shower affected him, are sufficient.

Boclair has also adequately alleged deliberate indifference in regards to the shower incident, given his assertions that Franco retrieved Boclair from his cell and, under orders from Sievers, placed him in the shower and left him there. Franco, at the very least, would have seen the amount of clothing Boclair was wearing and would have been able to feel the cold conditions in the shower when he placed Boclair inside. At the pleading stage, when this Court must draw all inferences in favor of Boclair, this is sufficient.

The Motion to Dismiss is denied as to Boclair's allegations regarding the malfunctioning toilet and the January 2012 shower incident. Boclair raises no allegations linking Godinez or Rabideau to those incidents, however. For that reason, Godinez[3] and Rabideau are dismissed from the suit without prejudice.

---

[3] Boclair sues Godinez in his personal and official capacities. Because he has failed to allege Godinez's involvement in the toilet and cold shower area incidents that survive the Motion to Dismiss, his claim against Godinez in his personal capacity is dismissed without prejudice. The Court also dismisses Godinez in his official capacity without prejudice. "An official capacity claim against an individual defendant constitutes a claim against the government entity itself." *Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997). A suit against Godinez in his official capacity, therefore, is effectively a suit against the state of Illinois. *See Will v. Mich.*

**II. Count Based on Failure to Protect**

Boclair's Second Amended Complaint fails to state a claim that the defendants violated the Eighth Amendment by failing to protect him. Prison officials have a duty under the Eighth Amendment "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (internal quotation marks omitted). "To state a failure to protect claim, a plaintiff-inmate must allege that (1) 'he is incarcerated under conditions posing a substantial risk of serious harm,' and (2) defendant-officials acted with 'deliberate indifference' to that risk." *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834).

Boclair has failed to plead sufficient facts to satisfy that second, subjective prong: that the defendants acted with deliberate indifference in regards to his protection. The Supreme Court has stated that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 838; *see also Brown*, 398 F.3d at 913 (quoting same). In cases alleging a failure to protect, an inmate "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015).

---

*Dept. of State Police*, 491 U.S. 58, 71 (1989) ("But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). Boclair may not pursue money damages against an official in their official capacity, therefore, because the Eleventh Amendment "precludes a citizen from suing a state for money damages in federal court without the state's consent." *Wynn v. Southward*, 251 F.3d 588, 592 (7th Cir. 2001). He may seek injunctive relief based on an official-capacity claim, however, if he alleges that the governmental entity's policy or custom "played a part in the violation of federal law." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Will*, 491 U.S. at 71 n.10. Boclair's allegations in this regard fail to support an official-capacity claim against Godinez. Boclair alleges that Godinez "has personal firsthand knowledge of the allegations in this Complaint and, despite such knowledge, has failed to remedy the widespread practices described herein." SAC ¶ 20. That blanket allegation does not satisfy the applicable pleading standards set out above.

Complaints to officials "that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Id*. at 480-81. "By contrast, a complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Id.* at 481.

Boclair alleges that a particular inmate—"Jarvis 'Jiro' Jackson, a known STG member"—had, since September of 2013, been encouraging other gang members to attack Boclair in retribution for the killing of Riley. He also asserts that on October 31, 2013, three inmates, whom he identifies by their nicknames and states were gang members, threatened him with being "tossed over 'three gallery' for getting Digger killed." Even assuming that these allegations satisfy the first prong of the text by showing that Boclair faced a substantial risk of serious harm, Boclair has failed to plead that he communicated Jackson's activities or the October 2013 threat to the defendants. Boclair asserts generally that he has filed "numerous grievances regarding intimidation and threats of physical assault by violent STG members." SAC ¶ 70. He goes on to allege that he filed a string of specific grievances, on particular dates, in which he repeatedly requested protective custody and challenged prison officials' refusal to provide it to him, but he never alleges that he informed prison officials of Jackson's activities, that he relayed the October 2013 threat to them, or that he ever communicated the identities of any individuals who posed a risk to him.

Boclair alleges that given his "history of having been assaulted by known STG members while in IDOC custody," the defendants should have "known to take these new threats seriously" and to promptly place in him protective custody. SAC ¶ 79. But the defendants could not have

known to take the alleged threats seriously if Boclair never informed them of the threats in the first place. In addition, Boclair's only recited prior history of having been assaulted is the attack he says he endured in February 2011. But Boclair has alleged no facts indicating that the defendants were on notice that he was *still* facing a substantial risk more than two years after that attack, in the fall of 2013, let alone more than four years after that attack, when he asserts he was physically assaulted by "other inmates" in May of 2015. *See* SAC ¶ 105.

Boclair has therefore failed to allege that the defendants acted with deliberate indifference, and Count II is dismissed without prejudice. The following defendants are also dismissed from the case without prejudice, as Boclair names them only in connection with Count II: Tarry Williams, Lemke, Anderson, Bowlin, Hawk, Florence, and Montes.

\*     \*     \*

The defendants' Motion to Dismiss is therefore granted in part and denied in part. The allegations in Count I concerning an under-heated cell and a cockroach infestation are dismissed, and Count II is dismissed as well. Although the plaintiff had an opportunity to amend his complaint in response to the defendant's motion to dismiss, he has not had the opportunity to cure the deficiencies identified by the Court, so the dismissals are without prejudice. The Motion to Dismiss is denied as to Count I's allegations regarding inadequate plumbing and the January 2012 shower incident.

Date: April 21, 2017

John J. Tharp, Jr.
United States District Judge